# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JODI GILL, as Representative and Next Friend of GLENN OSCAR GILL, a Long Term Care Facility Resident, on his behalf and on behalf of all others Similarly Situated** : | **No. 20-cv-02038** |
| : | |
| **and** : | **HON. CHAD F. KENNEY** |
| : | |
| **GREG HUBERT, as Representative and Next Friend of Nethia Knight, a Long Term Care Facility Resident, on her behalf and on behalf of all others Similarly Situated** : | |
| : | |
| **Plaintiffs,** : | |
| : | |
| **v.** : | |
| : | |
| **PENNSYLVANIA DEPARTMENT OF HEALTH and Rachel Levine, M.D. In Her Official Capacity as Secretary of Health of the Commonwealth of Pennsylvania** : | |
| : | |
| **Defendants.** : | |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   FACTUAL AND PROCEDURAL BACKGROUND .......................................... 2

    A.   THE DEPARTMENT'S RESPONSE TO COVID-19 ........................................ 2

    B.   PLAINTIFF'S ALLEGATIONS .................................................................... 6

    C.   PROCEDURAL HISTORY ......................................................................... 7

III.  ARGUMENT ...................................................................................................... 8

    A.   STANDARD OF REVIEW ......................................................................... 8

    B.   PLAINTIFF'S MANDATORY INJUNCTION IMPROPERLY SEEKS TO USURP
         THE POWER AND EXPERTISE OF THE DEPARTMENT. ................................ 9

    C.   THE COURT CANNOT GRANT THE RELIEF SOUGHT BY PLAINTIFF. ....... 12

    D.   PLAINTIFF HAS NOT SHOWN IRREPARABLE HARM. .............................. 14

    E.   PLAINTIFF'S CLAIMS FAIL AS A MATTER OF LAW. .............................. 15

        1.   Plaintiff's Fourteenth Amendment Claim Fails as a Matter of
             Law. .................................................................................................. 15

             (a).   Substantive Due Process ............................................. 16

             (b).   Deliberate Indifference Under the Eighth Amendment ............... 18

        2.   Plaintiff's RA and ADA Claims Fail as a Matter of Law. ......................... 19

             (a).   Plaintiff Does Not Allege Any Current Policy or Action
                    That Allegedly Discriminates Against Residents of
                    SNFs. ................................................................................ 19

             (b).   Plaintiff Has Failed to Allege That Defendants Took
                    Any Action "Because of" Mr. Gill's Alleged
                    Disabilities. .................................................................... 21

             (c).   Plaintiff's   Proposed   Accommodations   Would
                    Fundamentally Alter, and Hamper, the Department's
                    COVID Response ........................................................... 23

        3.   Plaintiff's FNHRA Claim Fails as a Matter of Law Because
             FNHRA Does Not Impose Any Obligations Upon Defendants. .............. 24

    F.   THE PUBLIC INTEREST WEIGHS HEAVILY IN FAVOR OF DENYING
         PLAINTIFF'S MOTION. ......................................................................... 25

IV.   CONCLUSION.................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Adams v. Freedom Forge Corp.*,
    204 F.3d 475 (3d Cir. 2000) ...................................................................... 12, 14, 15

*Allentown Women's Ctr., Inc. v. Sulpizio*,
    403 F. Supp. 3d 461 (E.D. Pa. 2019) ................................................................. 8, 15

*Alpha Painting & Constr. Colo. v. Del. River Port Auth. of Pa.* ,
    853 F.3d 671 (3d Cir. 2017) .............................................................................. 9-10

*Benedict v. Sw. Pa. Human Servs.*,
    98 F. Supp. 3d 809 (W.D. Pa. 2015) ........................................................... 17, 18, 19

*Bennington Foods L.L.C. v. St. Croix Renaissance Grp., L.L.P.*,
    528 F.3d 176 (3d Cir. 2008) ............................................................................... 8-9

*Boyd v. City of Phila.*,
    2020 WL 1531454 (E.D. Pa. Mar. 31, 2020) ........................................................ 19

*Burella v. City of Phila.*,
    501 F.3d 134 (3d Cir. 2007) ............................................................................... 17

*Byrd v. Aaron's, Inc.*,
    2011 WL 2672009 (W.D. Pa. June 16, 2011) ................................................. 14, 15

*Castillo v. Barr*,
    2020 WL 1502864 (C.D. Cal. Mar. 27, 2020) ...................................................... 18

*CG v. Pa. Dep't of Educ.*,
    734 F.3d 229 (3d Cir. 2013) .................................................................. 19, 20, 22, 23

*Comite De Apoyo a Los Trabajadores Agricolas v. Perez*,
    45 F. Supp. 3d 477 (E.D. Pa. 2014) ..................................................................... 9

*D.R. v. Middle Bucks Area Vocational Tech. Sch.*,
    972 F.2d 1364 (3d Cir. 1992) ......................................................................... 16, 17

*Davis v. Romney*,
    490 F.2d 1360 (3d Cir. 1974) ............................................................................. 12

*Del. Dep't of Nat'l Res. & Envtl. Control v. U.S. Army Corps of Eng'rs* ,
    681 F. Supp. 2d 546 (D. Del. 2010) ..................................................................... 10

*Easley by Easley v. Snider*,
    36 F.3d 297 (3d Cir. 1994) ............................................................................ 20, 23

*Emerson v. Thiel Coll.*,
    296 F.3d 184 (3d Cir. 2002) ............................................................................... 19

*Esshaki v. Whitmer*,
    2020 WL 2185553 (6th Cir. May 5, 2020) ........................................................ 25

*Grammer v. John J. Kane Reg'l Centers -Glen Hazel*,
    570 F.3d 520 (3d Cir. 2009) ......................................................................... 24

*Green v. City of Phila.*,
    92 F. App'x 873 (3d Cir. 2004) ............................................................... 17, 18

*Hickox v. Christie*,
    205 F. Supp. 3d 579 (D.N.J. 2016) ................................................................. 10

*Hudson v. Robinson*,
    678 F.2d 462 (3d Cir. 1982) ..................................................................... 20, 21

*In re Abbott*,
    956 F.3d 696 (5th Cir. 2020) ................................................................... 10, 11

*In re Rutledge*,
    956 F.3d 1018 (8th Cir. 2020) ............................................................. 10-11, 11

*In re United Healthcare Sys.*,
    1997 WL 176574 (D.N.J. Mar. 26, 1997) ........................................................ 10

*Jacobson v. Massachusetts*,
    197 U.S. 11 (1905) ................................................................................. 10, 11

*Jacobson v. Massachusetts*,
    197 U.S. 11, 25 S. Ct. 358, 49 L. Ed. 643 (1905) ............................................ 11

*Johnson v. Rendell*,
    56 F. Supp. 2d 547 (E.D. Pa. 1999) ......................................................... 18, 19

*Kongtcheu v. Constable*,
    2016 WL 270075 (D.N.J. Jan. 20, 2016) ................................................... 21, 22

*La. Plant v. Frazier*,
    564 F. Supp. 1095 (E.D. Pa. 1983) ................................................................. 18

*Lamberson v. Pennsylvania*,
    561 F. App'x 201 (3d Cir. 2014) ............................................................. 22, 23

*Liberty Res., Inc. v. Phila. Hous. Auth.*,
    528 F. Supp. 2d 553 (E.D. Pa. 2007) ....................................................... 22, 23

*Lindstrom v. St. Joseph's Sch. for the Blind, Inc.*,
    2016 WL 5723658 (D.N.J. Sept. 30, 2016) ..................................................... 22

*Lopez-Marroquin v. Barr*,
    955 F.3d 759 (9th Cir. 2020) ........................................................................ 11

*Marshall v. United States*,
    414 U.S. 417, 94 S. Ct. 700, 38 L. Ed. 2d 618 (1974) ............................................. 11

*Meyer v. CUNA Mut. Ins. Soc'y*,
    648 F.3d 154 (3d Cir. 2011) ..................................................................... 12

*Monmouth Legal Servs. Org. v. Carlucci*,
    330 F. Supp. 985 (D.N.J. 1971) ................................................................. 10

*Morrow v. Balaski*,
    719 F.3d 160 (3d Cir. 2013) ..................................................................... 17

*N.J. Tpk. Auth. v. Jersey Cent. Power & Light* ,
    772 F.2d 25 (3d Cir. 1985) .......................................................... 14, 20, 21

*Nextel Ptnrs. Inc., v. Kingston Twp.*,
    286 F.3d 687 (3d Cir. 2002) ................................................................ 20, 21

*Nken v. Holder*,
    556 U.S. 418 (2009) ............................................................................... 25

*Olmstead v. L.C. by Zimring ex rel. Zimring*,
    527 U.S. 581 (1999) ............................................................................... 21

*Providence Pediatric Med. Daycare, Inc. v. Alaigh*,
    672 F. App'x 172 (3d Cir. 2016) ........................................................ 20, 21

*Rhoads v. A.I. Dupont Hosp. for Children*,
    2006 WL 1409633 (E.D. Pa. May 22, 2006) ...................................... 22, 23

*Robinson v. Fair Acres Geriatric Ctr.*,
    722 F. App'x 194 (3d Cir. 2018) ........................................................ 24, 25

*S. Bay United Pentecostal Church v. Newsom*,
    140 S. Ct. 1613 (2020) ....................................................................... 11, 12

*S.R. v. Pa. Dep't of Human Servs.*,
    309 F. Supp. 3d 250 (M.D. Pa. 2018) ........................................................ 21

*Sch. Bd. of Nassau Cty. v. Arline*,
    480 U.S. 273 (1987) ............................................................................... 10

*Starr v. Price*,
    385 F. Supp. 2d 502 (M.D. Pa. 2005) ....................................................... 17

*Swain v. Junior*,
    958 F.3d 1081 (11th Cir. 2020) ......................................................... 11, 25

*Swain v. Junior*,
    2020 WL 3167628 (11th Cir. June 15, 2020) ............................................ 25

*Thakker v. Doll*,
    2020 WL 1671563 (M.D. Pa. Mar. 31, 2020) ...................................................... 18

*URL Pharm., Inc. v. Reckitt Benckiser Inc.*,
    2016 WL 1592695 (E.D. Pa. Apr. 20, 2016) ......................................................... 8

*Valentine v. Collier*,
    956 F.3d 797 (5th Cir. 2020) ............................................................................. 25

*Victory v. Berks County*,
    789 F. App'x 328 (3d Cir. 2019) ............................................................... 9, 13, 25

*Victory v. Berks County*,
    2020 WL 236911 (E.D. Pa. Jan. 15, 2020) ......................................................... 14

*Walter v. Pike County*,
    544 F.3d 182 (3d Cir. 2008) .............................................................................. 17

*White v. N.J.*,
    514 F. App'x 258 (3d Cir. 2013) .................................................................... 18, 19

*Will v. Mich. Dep't of State Police*,
    491 U.S. 58 (1989) ...................................................................................... 15, 24

*Ye v. United States*,
    484 F.3d 634 (3d Cir. 2007) ........................................................................ 16, 17

## Statutes

42 U.S.C. § 1396r ................................................................................................. 24

42 U.S.C. § 1983.......................................................................................... 7, 15, 24

Defendants, the Pennsylvania Department of Health (the "Department") and the Honorable Rachel L. Levine, M.D., in her official capacity as Secretary of Health for the Commonwealth of Pennsylvania (together "Defendants"), hereby submit this Response in Opposition to Plaintiff's Motion for Preliminary Injunction.  For the reasons set forth below, the Court should deny Plaintiff's motion as a matter of law.

I.    **INTRODUCTION**

Despite Plaintiff's bald claims of "inaction" by the Department, the actual facts document that the Department and the Commonwealth have consistently taken an aggressively effective, science-based approach to combatting the COVID-19 crisis, including in Skilled Nursing Facilities ("SNFs").[1]  While many states throughout the nation are seeing staggering increases in COVID-19 cases, Pennsylvania remains focused on its science-based approach, which has undeniably produced results that have saved the lives of countless Pennsylvanians, and that very few states have been able to achieve to date.  Indeed, on June 17, 2020, Pennsylvania announced that it is one of only three states in the nation to show a downward trajectory of COVID-19 cases for more than 42 days.  (Ex. 1, Decl. of Sarah Boateng, ¶ 6).  In stark contrast to other states of comparable size and population whose reopening processes have been stymied by the resurgence of COVID-19 cases in recent weeks, Pennsylvania is safely and cautiously opening back up, as every county in Pennsylvania other than Lebanon County will be in the "Green Phase," the final phase of recovery, before the lifting of all restrictions, as of June 26, 2020.  (*Id.*, ¶ 7).

Despite Pennsylvania's proven effectiveness in responding to the COVID-19 pandemic, Plaintiff's counsel and their purported "experts" brazenly come before this Court – six weeks after filing the first of three complaints – with a "we know better" approach to managing

---

[1] Although Plaintiff uses the term "Long-Term Care Facility," Mr. Gill resides in, and Plaintiff's pleadings focus on, what is called a "Skilled Nursing Facility," which is just one type of "Long-Term Care Facility."  (Ex. 1, Decl. of Sarah Boateng, ¶ 10).

Pennsylvania's response to a global pandemic.  Plaintiff impermissibly seeks this Court's assistance in second-guessing the reasoned and highly effective expertise of the Department and the Secretary in protecting Pennsylvania's most vulnerable population.  Incredibly, Plaintiff asks this Court to compel the Commonwealth to adopt a "plan" that would essentially transfer the Department's responsibility to respond to a public health crisis to a handful of private lawyers; compel the Department to conduct testing of Plaintiff's choosing; and to require the government to award highly lucrative contracts to third-party vendors of Plaintiff's choosing, including a $2.4 million contract to one of their own purported "experts" who has submitted an affidavit in support of Plaintiff's Motion for Preliminary Injunction.  (Doc. 18-24, p.44).

As set forth below, Plaintiff's requested relief is barred as a matter of law, and this Court should deny Plaintiff's motion.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    THE DEPARTMENT'S RESPONSE TO COVID-19

The Department does not own or operate any SNFs, including Brighton where Mr. Gill resides.  (Ex. 1, Boateng Decl., ¶ 11).  The Department has disseminated information to SNFs through Health Alert Network notices ("HANs"),[2] guidance documents, press releases, and press conferences.  The first HAN was issued January 9, 2020, long before any cases were confirmed in Pennsylvania, which instructed SNFs to immediately notify the Department of any patients exhibiting symptoms of COVID-19.  (*Id.*, ¶ 12).  The Department issued further guidance to SNFs on January 31, 2020, when it issued a HAN with specific recommendations for SNFs, and on February 27, 2020, when it issued Interim Guidelines for Health Care Professionals providing specific references to infection prevention and control recommendations.  (*Id.*, ¶¶ 13-14).

---

[2] HANs are developed and reviewed by the Department's epidemiologists based on guidance from the Centers for Disease Control and Prevention and the Council of State and Territorial Epidemiologists, which are directed for the provider community.  (*Id.*, ¶ 10, n.2).

2

The Department alerted medical providers of the first confirmed cases of COVID-19 in Pennsylvania on March 6, 2020.  Immediately thereafter, it issued "Infection Prevention and Control Recommendations for Patients with COVID-19 in Healthcare Settings," followed by guidelines directed specifically at nursing facilities.  (*Id.*, ¶¶ 15-16).  These Guidelines explained, *inter alia*, that eye protection, gowns, gloves, and facemasks must be worn and that patients with suspected COVID-19 should be segregated from other patients.  (*Id.*).  Throughout the past three months, the Department has issued numerous HANs, guidance documents, and orders, specifically directed at LTCFs in order to combat the spread of COVID-19, which belie the allegations in Plaintiff's Second Amended Complaint.  And on June 8, 2020, the Secretary issued an Order that mandated universal COVID-19 testing of all SNF residents and staff.  (*Id.*, ¶ 23).

Indeed, Plaintiff's allegations regarding the Department's "inaction" or "failure to act" are contradicted by the actual facts.  For example, Plaintiff alleges that residents and staff are not equipped with personal protective equipment ("PPE"), but, in reality, on April 3, 2020, the Department issued a HAN titled "Universal Masking of Health Care Workers and Staff in Congregate Care Settings," in which the Department stated that there should be "universal masking of all persons entering the facility" and daily screening of staff for COVID-19 symptoms.  (*Id.*, ¶ 23).  For comparison sake, the CDC and the Joint Commission did not make similar recommendations until April 13, 2020, and April 23, 2020, respectively.   (*Id.*).  Moreover, through public/private partnerships and collaboration among state agencies, LTCFs have received over 2,300 deliveries of PPE to date, including 306,944 gowns, 336,559 face shields, 1,023,800 gloves, 2,807,570 N-95 masks, and 1,175,200 surgical masks.  (*Id.*, ¶ 25).  The Department is also coordinating with the Pennsylvania Emergency Management Agency ("PEMA") and the Pennsylvania National Guard to deliver these supplies.  (*Id*., ¶¶ 26-33, 38-39).

The same is true with respect to Plaintiff's allegation that the Department has no plan in place for segregating, or "cohorting" residents.  To the contrary, on April 14, 2020, the Department issued a HAN regarding the Department's guidance on "cohorting" residents in SNFs, including specific examples of when cohorting is beneficial and when it may lack value. (*Id.*, ¶ 19).  The Department provided further guidance on "cohorting" of residents and staff in a May 12, 2020, HAN titled "Test-based Strategies for Preventing Transmission of the Virus that Causes COVID-19 in Skilled Nursing Facilities," and in its May 12, 2020, updated "Interim Guidance for Nursing Care Facilities."  (*Id.*, ¶¶ 20-21).

Significantly, on June 8, 2020, the Department issued an Order that mandated universal testing of all SNF residents and staff.  (*Id.*, ¶ 23).  The Department is providing technical, material, staffing and laboratory support to complete universal testing consistent with the Secretary's order.  (*Id.*, ¶¶ 26-39).  To further assist, the Department has executed a contract with CVS Health to offer COVID-19 testing services to SNFs statewide, a comprehensive testing solution that provides supplies, specimen collection, analysis, and reporting.  (*Id.*, ¶ 25).  The Department also executed a contract with Eurofins to provide additional overflow capacity.  (*Id*)  All results will be provided to the facility and to the Department.  (*Id.*).  Moreover, CMS has announced that COVID-19 testing will be covered for Medicaid and Medicare residents.  (*Id.*).  To date, over 150 facilities have reported completing universal testing.  (*Id.*, ¶ 37).

In addition to providing this written guidance, the Department provides assistance to every SNF with an outbreak, defined as a single case in a resident or staff member.  The Department coordinates with the facility to perform contact tracing, and to isolate and quarantine positive and exposed persons.  (*Id.*, ¶¶ 33-39).  The Department co-leads an interagency Pennsylvania Assessment and Support Team ("PAST") which leverages multiple state agencies'

efforts, including PEMA, the Pennsylvania Department of Human Services, the Pennsylvania National Guard, and private contractors, such as CVS Health to: (a) Conduct infection control assessments; (b) Provide in-person PPE training and fit-testing; (c) Provide critically needed staffing support where staff have been impacted by their own illness or quarantine; (d) Assist facilities in performing universal testing, collecting specimens from residents and staff, and training healthcare personnel on how to conduct mass testing in their facility. (*Id.*, ¶ 31).  To date, PAST has prevented the evacuation of 10 SNFs by supplementing their staffing.  (*Id.*, ¶ 32).

PAST, in collaboration with the Pennsylvania National Guard and contractors have directly provided more than 150 facility-days of direct staffing for patient care in facilities in crisis and trained over 1,250 providers in proper infection control and PPE use.  (*Id.*).  These trainings were provided on-site with direct staffing assistance to maximize the training opportunities.  (*Id.*).  At each mass testing mission with which the Department assists, the facility is trained on best practices for specimen collection, packaging, and data management so that they can complete the testing again on their own.  (*Id.*).

The keystone allegations of Plaintiff's Second Amended Complaint are that the Department "fail[ed] ... to conduct inspections" and that the Department's inspections of SNFs "have come nearly to a halt."  (Doc. 15, ¶¶ 9-10).  Plaintiff alleges that the "decision to stop inspections of [SNFs] was made arbitrarily and without consideration for the health, safety, and welfare of the residents," (*id.*, ¶ 11), and that Plaintiff would not have suffered harm "had inspections not been halted," (*id.*, ¶ 10).  But, again, these allegations are belied by the actual facts; it is simply not true that inspections "have come nearly to a halt."  Rather, the Department conducted nearly 1,500 inspections at nursing homes from February through April, including:

- February: 450 surveys of 314 separate facilities; 119 building safety surveys; 331 patient care surveys; and 288 complaint investigations.

- <u>March</u>: 537 surveys of 359 separate facilities; 150 building safety surveys; 387 patient care surveys; and 321 complaint investigations.
- <u>April</u>: 486 surveys of 336 separate facilities; 113 building safety surveys; 373 patient care surveys; and 298 complaint investigations.

(Ex. 1, Boateng Decl., ¶ 27).  Moreover, the Department has assisted the deployment of 69 Pennsylvania National Guard Strike Teams to 34 LTCFs, including: 32 site assessments, 10 PPE trainings, 13 COVID-19 mass testing missions, and 14 facility staffing missions.  (*Id.*, ¶ 28).

### B.   PLAINTIFF'S ALLEGATIONS

With respect to the named Plaintiff, Ms. Jodi Gill, on behalf of her father, Glenn Oscar Gill, the Second Amended Complaint alleges that he is a resident of Brighton Rehabilitation and Wellness Center in Beaver, Pennsylvania.  (Doc. 15, ¶ 44).  Ms. Gill alleges that on April 10, 2020, she was contacted by a nurse at Brighton regarding her consent to provide a treatment to her father consisting of a combination of hydroxychloroquine and zinc.  (*Id.*, ¶ 45, Ex. E).  Ms. Gill responded with a follow-up question, to which the nurse at Brighton responded.  (*Id.*, Ex. E).  Ms. Gill then responded and thanked the nurse stating "I consent, but I want the language at the end 'I wish to proceed with this treatment as I believe it to be the best course of action in the current National Emergency.' stricken as I do NOT consent to this language or statement."  (*Id.*)  The nurse from Brighton explained that she could not alter the consent form in any way.  (*Id.*)  Ms. Gill then thanked the nurse again, and consented to the treatment.  (*Id.*)

Ms. Gill also concedes that as of May 12, 2020, Mr. Gill had not tested positive and had been sequestered along with other negative residents in a separate wing of the facility.  (Doc.32-5, ¶¶ 28-29, 31).  As of that time, "all staff and resident were being regularly tested."  (*Id.* ¶ 31).  However, on May 28, 2020, Gill tested positive and now has been moved back to the wing with other COVID-positive residents.  (*Id.*, ¶ 31).

6

Simply put, Plaintiff, along with their private attorneys and purported "experts," are seeking to commandeer the Department in the middle of a global health crisis based upon allegations that have no factual support, and with the intention of allowing those who have supported Plaintiff's Motion by affidavit to profit from the "plan" that Plaintiff asks this Court to foist upon the Commonwealth.

### C.  PROCEDURAL HISTORY

The original, single Plaintiff filed the first of three complaints on April 28, 2020, but did not file any motion seeking either expedited discovery or preliminary relief.  (Doc. 1).  Plaintiff then filed an Amended Complaint on May 12, 2020.  (Doc. 5).  Again, Plaintiff did not file any motion seeking expedited discovery or preliminary relief.  (*Id.*)  Plaintiff then filed a premature Motion for Class Certification, which this Court denied on May 19, 2020.  (Docs. 7 & 9).

In its May 19, 2020 Order, the Court also directed that the parties first litigate Plaintiff Gill's individual claims before proceeding to any further matters.  (Doc. 9).  In response to that Order, Plaintiff changed course and, on June 1, 2020, Plaintiff filed a Second Amended Complaint without seeking leave of Court (in violation of Rule 15).  (Doc. 15).  The Second Amended Complaint added Dr. Rachel Levine, in her official capacity as Secretary of the Department of Health and asserted the following purported "causes of action": (1) violation of the Rehabilitation Act ("RA"); (2) violation of Titles II and III of the Americans with Disabilities Act ("ADA"); (3) violation of the Affordable Care Act ("ACA"); (4) violation of the Social Security Act; (5) violation of the Federal Nursing Home Reform Amendments ("FNHRA") pursuant to § 1983; (6) violation of the Pennsylvania Disease Prevention and Control Law ("PDPCL"); (7) violation of Substantive Due Process and Deliberate Indifference pursuant to § 1983; and (8) violations of the "Nuremburg Code and Declaration of Helsinki."  (Doc.15).

Then, on June 5, 2020, six (6) weeks after initiating this action and first claiming the need

7

for immediate injunctive relief, Plaintiff filed a Motion for Preliminary Injunction.  (Doc.18).[3]
Plaintiff continued to supplement that Motion over the course of the next week, filing two (2)
supplemental declarations on June 12, 2020, (Docs. 21 & 25), followed by four (4) additional
declarations and other exhibits on June 18, 2020.  (Doc.32).   On June 24, 2020, the Court
entered a Scheduling Order regarding this Motion, limiting the scope "to Mr. Gill's case and
particular circumstances only."  (Doc. 34, ¶ 1).  For the reasons set forth below, the Court should
deny Plaintiff's Motion as a matter of law.

## III.   ARGUMENT

### A.   STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right."
*Allentown Women's Ctr., Inc. v. Sulpizio*, 403 F. Supp. 3d 461, 466 (E.D. Pa. 2019) (Kenney, J.).
"Awarding preliminary relief, therefore, is only appropriate 'upon a clear showing that the
plaintiff is entitled to such relief.'"  *Id*.  "[T]o obtain a preliminary injunction[,] the moving party
must show as a prerequisite (1) a reasonable probability of eventual success in the litigation, and
(2) that it will be irreparably injured ... if relief is not granted."  *Id*.  "In addition, the district
court, in considering whether to grant a preliminary injunction, should take into account, when
they are relevant, (3) the possibility of harm to other interested persons from the grant or denial
of the injunction, and (4) the public interest."  *Id*.

Moreover, "[a] mandatory injunction is 'looked upon disfavorably and [is] generally only
granted in compelling circumstances."  *URL Pharma, Inc. v. Reckitt Benckiser, Inc.*, 2016 WL
1592695, at *3 (E.D. Pa. Apr. 20, 2016).  Thus, where the plaintiff is seeking a mandatory
injunction, it "must meet a higher standard."  *Bennington Foods LLC v. St. Croix Renaissance,*

---

[3] The Motion for Preliminary Injunction does not rely upon Plaintiff's claims concerning the ACA,
PDPCL, or the Nuremberg Code and Declaration of Helsinki.

*Grp., LLP*, 528 F.3d 176, 179 (3d Cir. 2008).  Under this "heightened standard for mandatory preliminary injunctions," a plaintiff must show an "indisputably clear need for such relief." *Victory v. Berks Cty.*, 789 F. App'x 328, 334 (3d Cir. 2019).

      **B.**    **PLAINTIFF'S MANDATORY INJUNCTION IMPROPERLY SEEKS TO USURP THE POWER AND EXPERTISE OF THE DEPARTMENT.**

Plaintiff's Motion seeks a drastic mandatory injunction that asks the Court to supplant and invalidate the expertise of the Department, and substitute in its place the judgment of Plaintiff's private attorneys and their purported "experts," one of whom stands to receive a $2.4 million contract under Plaintiff's "plan" if Plaintiff's Motion is granted.  (Doc. 18-24, p.44). Despite the fact that the Commonwealth has been recognized for its unmatched efforts in combating the COVID-19 pandemic, announcing on June 17, 2020, that it was one of only three States in the nation to have a consistent downward trajectory on COVID-19 cases over a forty-two (42) day period,[4] Plaintiff seeks to force the Department to abruptly and unjustifiably change course, and implement a new privately crafted plan that Plaintiff and their purported "experts" argue is "better" than the current plan devised by the Department's own in-house experts which, to date, has dramatically slowed the spread of contamination from COVID-19, and undeniably saved the lives of thousands of Pennsylvanians at risk of infection.

This is improper as a matter of law as "[i]t is the agency's prerogative to determine how best to marshal limited resources and personnel to carry out its delegated responsibilities." *Comite De Apoyo a Los Trabajadores Agricolas v. Perez*, 45 F. Supp. 3d 477, 493 (E.D. Pa. 2014).  Indeed, the Department is staffed with numerous public health experts with years of experience and training on public health matters, (*see* Ex. 1, Boateng Decl., ¶¶ 3-5, 10 n.2), and thus the "district court is not to substitute its judgment for [that of] the agency[]."  *Alpha*

---

    [4]   *See*   https://www.governor.pa.gov/newsroom/gov-wolf-states-measured-phased-reopening-plan-succeeding-as-other-states-see-cases-rise/

*Painting & Constr. Co.*, *Inc. v. Delaware River Port Auth. of Pennsylvania & New Jersey*, 853 F.3d 671, 689 (3d Cir. 2017); *State of Delaware Dep't of Nat. Res. & Envtl. Control v. U.S. Army Corps of Engineers (USACOE)*, 681 F. Supp. 2d 546, 558 (D. Del. 2010) (""It is not the role of a reviewing court to second-guess the scientific judgments of the [agency]."); *Monmouth Legal Servs. Org. v. Carlucci*, 330 F. Supp. 985, 994 (D.N.J. 1971) ("this Court cannot substitute its own judgment for that of the agency.").[5]

In fact, the Courts of Appeals have consistently recognized the impermissibility of the type of relief sought by Plaintiff in the wake of the COVID-19 pandemic.  For example, in *In re Abbott*, 956 F.3d 696 (5th Cir. 2020), the Fifth Circuit, relying upon *Jacobson v. Massachusetts*, 197 U.S. 11 (1905), vacated the district court's issuance of a preliminary injunction, holding that the preliminary injunction "usurped the power of the state in a public health emergency." *Id*. at 718.  The Fifth Circuit explained that "Respondents have submitted declarations of infectious disease experts who believe GA-09 is profoundly misguided," while "Texas authorities believe, to the contrary, that GA-09 is critical to protect the state's citizens and has supported that view with its own medical experts."  *Id*. at 716.  But, under *Jacobson*, "Courts have no authority to ask whether a 'particular method [is] — perhaps, or possibly — not the best. Instead, courts may ask only whether the state has acted in an 'arbitrary, unreasonable manner.'"  *Id*.

Thus, the Fifth Circuit held that "if the choice is between two reasonable responses to a public crisis, **the judgment must be left to the governing state authorities**."  *Id*. (emphasis added); *see also In re Rutledge*, 956 F.3d 1018, 1031 (8th Cir. 2020) (reversing TRO because the

---

[5]  This is particularly true where, as here, the issue concerns matters of public health.  *See, e.g.*, *Sch. Bd. of Nassau Cty., Fla. v. Arline*, 480 U.S. 273, 288 (1987) (explaining that "courts normally should defer to the reasonable medical judgments of public health officials"); *Hickox v. Christie*, 205 F. Supp. 3d 579, 594 (D.N.J. 2016) (refusing to engage in "judicial second-guessing of the discretionary judgments of public health officials acting within the scope of their (and not my) expertise."); *In re United Healthcare Sys., Inc*., 1997 WL 176574, at *8 (D.N.J. Mar. 26, 1997) (same).

district court "usurped the functions of the state government by second-guessing the State's policy choices in responding to the COVID-19 pandemic"); *Lopez-Marroquin v. Barr*, 955 F.3d 759, 761 (9th Cir. 2020) ("We are not epidemiologists and have no expertise managing either pandemics or detention facilities"); *Swain v. Junior*, 958 F.3d 1081, 1090 (11th Cir. 2020) ("The injunction hamstrings MDCR officials with years of experience running correctional facilities, and the elected officials they report to, from acting with dispatch to respond to this unprecedented pandemic."). Likewise, Chief Justice Roberts, in concurring in the denial of a request to enjoin aspects of the State of California's response to COVID-19, recently explained:

> Our Constitution principally entrusts "[t]he safety and the health of the people" to the politically accountable officials of the States "to guard and protect." *Jacobson v. Massachusetts*, 197 U.S. 11, 38, 25 S.Ct. 358, 49 L.Ed. 643 (1905). When those officials "undertake[ ] to act in areas fraught with medical and scientific uncertainties," their latitude "must be especially broad." *Marshall v. United States*, 414 U.S. 417, 427, 94 S.Ct. 700, 38 L.Ed.2d 618 (1974). Where those broad limits are not exceeded, they should not be subject to second-guessing by an "unelected federal judiciary," which lacks the background, competence, and expertise to assess public health and is not accountable to the people.
>
> That is especially true where, as here, a party seeks emergency relief in an interlocutory posture, while local officials are actively shaping their response to changing facts on the ground. The notion that it is "indisputably clear" that the Government's limitations are unconstitutional seems quite improbable.

*S. Bay United Pentecostal Church v Newsom*, 140 S. Ct. 1613, 1613-14 (2020).[6]

As set forth at length *supra*, the combined efforts of the Commonwealth and the Department in combating the COVID-19 pandemic, grounded in Pennsylvania's science-based approach, have been as successful, if not more, than any comparable state in the country. Yet, Plaintiff asks the Court to discard the judgment of the very Pennsylvania officials responsible for

---

[6] Notably, these cases rely upon *Jacobson v. Massachusetts*, 197 U.S. 11 (1905) – the principal case upon which Plaintiff relies (Br. at 14-15) – as support for ***denying an injunction that directs a State how to proceed in responding to COVID-19***. *Newsom*, 140 S. Ct. at 1613-14; *In re Abbott*, 956 F.3d at 703-05, 710-13, 716-18; *In re Rutledge*, 956 F.3d at 1027-32.

these undeniable successes and substitute in their place the personal and private judgment of Plaintiff's private lawyers and their purported "experts," judicially anointing them as the new heads of Pennsylvania's response to the COVID-19 crisis, and allowing them to personally profit from Plaintiff's proposal.  This is highly improper as the Constitution "principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'"  *Newsom*, 140 S. Ct. at 1613-14.  Any suggestion that the Commonwealth's response to the COVID-19 crisis has been unreasonable or arbitrary is simply not credible, and is directly contradicted by the facts and the results of the Department's response to the pandemic. Accordingly, the injunctive relief requested by Plaintiff must be denied as a matter of law.

## C.    THE COURT CANNOT GRANT THE RELIEF SOUGHT BY PLAINTIFF.

Plaintiff seeks an unprecedented, mandatory injunction that would substitute the judgment of Plaintiff's private lawyers and their purported "experts" for the judgment of the Pennsylvania Department of Health.  (Doc.18-3).  The Motion seeks to bind all nursing home residents and staff across the Commonwealth at every SNF in Pennsylvania and includes a request that the Court order the Department to sign a $2.4 million contract with one of Plaintiff's experts. (*Id.*; Doc. 18-24, p.44).  However, as this Court recognized in its Order of June 24, 2020, seeking a preliminary injunction on a class wide basis is improper at this time because no class has been certified, and thus, the scope must be limited "to Mr. Gill's case and particular circumstances only," (Doc. 34, ¶ 1).  *See Davis v. Romney*, 490 F.2d 1360, 1366 (3d Cir. 1974) ("Relief cannot be granted to a class before an order has been entered determining that class treatment is proper."); *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 490 (3d Cir. 2000) ("Merely petitioning for class certification cannot provide plaintiffs the right to be treated collectively"; courts "must view the claim for injunctive and declaratory relief as the individual claim of the named plaintiffs"); *Meyer v. CUNA Mut. Ins.*, 648 F.3d 154, 170 (3d Cir. 2011).

12

Plaintiff's Motion for Preliminary Injunction is singularly focused on class wide relief. In fact, the Motion does not even mention Mr. Gill, or why *he* is likely to succeed on *his* claim and why *he* will suffer irreparable harm.  Accordingly, Plaintiff has not carried her higher burden of an "indisputably clear need" for mandatory injunctive relief. *Victory*, 789 F. App'x at 334.

Moreover, the Motion requests that the Court order the Department to take several actions that the Department is already taking.  For example, Plaintiff seeks an order directing the Department to "order testing of all long-term care facility residents and staff who have not already tested positive," provide the facilities with training on how to accomplish this testing, and maintain all the data regarding that testing.  (Doc. 18-3, ¶¶ 1-2, 4, 10).  However, the Department already ordered all SNFs to conduct the testing that Plaintiff asks this Court to direct.  (Ex. 1, Boateng Decl., ¶¶ 23, 33-39).  Moreover, the Department is coordinating with PEMA and the Pennsylvania National Guard to train and assist facility staff with testing, and to provide access to the Department's public health laboratory in the Bureau of Laboratories.  (*Id.*, ¶¶ 26-36).  And, through PAST, the Department has assisted facilities in performing universal testing, detecting asymptomatic cases, and complying with the Secretary's Order.  (*Id.*, ¶¶ 31-32).  The Department has ordered SNFs to report all testing data to the Department.  (*Id.*, ¶ 22).

Plaintiff also seeks an order directing the Department to provide all residents with cloth face masks.  (Doc. 18-3, ¶ 3).  However., through public/private partnerships and collaboration among state agencies, LTCFs have received over 2,300 deliveries of PPE to date, which has included 306,944 gowns, 336,559 face shields, 1,023,800 gloves, 2,807,570 N95 masks and 1,175,200 surgical masks.  (*Id.*, ¶ 25).  Likewise, Plaintiff seeks an Order directing the Department to "[d]evelop and launch a cohorting program to separate positive and negative residents," (Doc. 18-3, ¶ 9), which the Department already directed months ago. (Ex. 1, Boateng

13

Decl., ¶¶ 19-21, 33, 38-39).

Because the Department is already engaging in these actions, Plaintiff cannot be awarded injunctive relief compelling the same actions. *See Victory v. Berks Cty*., 2020 WL 236911, at *32 (E.D. Pa. Jan. 15, 2020) (refusing to enter injunction mandating defendants take two actions because defendants "already did both of these"); *New Jersey Tpk. Auth. v. Jersey Cent. Power & Light*, 772 F.2d 25, 31 (3d Cir. 1985) ("the cessation of the conduct complained of makes the case moot if subsequent events make it clear that the wrongful behavior could not reasonably be expected to recur"). Accordingly, as to these Requests, the Court should deny Plaintiff's Motion.

### D.   PLAINTIFF HAS NOT SHOWN IRREPARABLE HARM.

"The irreparable harm requirement is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages." *Adams*, 204 F.3d at 484–85. "The relevant inquiry is whether the party moving for the injunctive relief is in danger of suffering the irreparable harm at the time the preliminary injunction is to be issued." *Byrd v. Aaron's, Inc*., 2011 WL 2672009, at *8 (W.D. Pa. June 16, 2011). "This is not an easy burden," *Adams*, 204 F.3d at 485, and "must not be speculative." *Id.* at 488. Indeed, "the use of judicial power to arrange relationships prior to a full determination on the merits is a weighty matter, and ... should not be exercised unless the moving party shows that it ***specifically and personally risks irreparable harm***." *Id*. at 487 (emphasis added).[7]

Here, Plaintiff's Motion for Preliminary Injunction does not even mention the named Plaintiff, Mr. Gill, much less that he "***specifically and personally risks irreparable harm***" absent entry of the proposed injunction. *Adams*, 204 F.3d at 487; *see generally* Doc.18-1. To the contrary, Plaintiff concedes that prior to Mr. Gill testing positive, he had been sequestered along

---

[7] Moreover, as the Court already recognized, the Court cannot consider the irreparable harm of unidentified proposed class members. *See Adams*, 204 F.3d at 490; *Byrd*, 2011 WL 2672009, at *8.

with other negative residents in a separate wing of the facility.  (Doc.32-5, ¶¶ 28-29, 31).  At that time, "all staff and resident were being regularly tested."  (*Id.*  ¶ 31).  However, on May 28, 2020, Gill tested positive for COVID-19 and was placed in the appropriate wing.   (*Id*., ¶ 31).

These meager allegations fail to demonstrate that Mr. Gill will suffer imminent and irreparable harm if the Court does not enter Plaintiff's wide-ranging injunction and effectively supplant the judgments of the Department of Health with the personal and private judgments of Plaintiff's counsel and their purported "experts." Because Plaintiff has not even attempted to show that Mr. Gill will suffer imminent and irreparable harm if the Court does not enter the proposed injunction, Plaintiff's Motion fails as a matter of law.  *Adams*, 204 F.3d at 487-88, 490; *Byrd*, 2011 WL 2672009, at *8-9.

###    E.    PLAINTIFF'S CLAIMS FAIL AS A  MATTER OF LAW.

"To show the first gateway factor required for a preliminary injunction, a reasonable probability of eventual success in the litigation, Plaintiff 'must demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not).'" *Allentown Women's Ctr*., 403 F. Supp. 3d at 466 (Kenney, J.).  In this case, Plaintiff contends that she has a reasonable probability of success on her Fourteenth Amendment, ADA/RA, and FNHRA claims. (Br. at 12, n.32).  However, each claim fails as a matter of law.

###    1.    Plaintiff's Fourteenth Amendment Claim Fails as a Matter of Law.

Plaintiff contends that the "inaction" of the Department and Secretary was a violation of their Substantive Due Process rights and constituted Deliberate Indifference under the Eighth Amendment.  (Br. at 13-22).  Each of these claims fails as matter of law.[8]

---

[8]  Plaintiff's claims against the Department itself fail as a matter of law because the Department is not a "person" for the purposes of §1983, and thus should be dismissed for that reason alone; Plaintiff's only cognizable claim is for prospective injunctive relief against Dr. Levine in her official capacity.  *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989).

15

### (a).    Substantive Due Process

"There is no affirmative right to governmental aid or protection under the Due Process Clause of the Fourteenth Amendment." *Ye v. United States*, 484 F.3d 634, 636 (3d Cir. 2007); *D.R. by L.R. v. Middle Bucks Area Vocational Tech. Sch*., 972 F.2d 1364, 1368-69 (3d Cir. 1992) (same).  "[T]he Supreme Court has long recognized that the Constitution generally confers no affirmative right to governmental aid, 'even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Ye*, 484 F.3d at 636.  There are, however, two exceptions to this rule: (1) the "special relationship" exception and (2) the "state-created danger" exception.  *Id*. at 637.

Under the "state-created danger" theory, a plaintiff must prove four elements: (1)   the harm ultimately caused was foreseeable and fairly direct; (2) a state actor acted with a degree of culpability that shocks the conscience; (3)    a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.  *Id.* at 638.   And, there are "three necessary conditions to satisfy the fourth element": "(1) a state actor exercised his or her authority, (2) the state actor took an affirmative action, and (3) this act created a danger to the citizen or rendered the citizen more vulnerable to danger than if the state had not acted at all." *Id*. at 639.

Here, Plaintiff argues that Defendants violated Mr. Gill's Substantive Due Process rights under the state-created danger theory by "exposing [them] to a danger which [they] would not

have otherwise faced."[9]  (Br. at 17).  Plaintiff's claims fail as a matter of law for two reasons.

*First*, Plaintiff's claim is expressly based upon Defendants' alleged "**inaction**," "**hands-off approach**," and "**failure to act**." (Br. at 1, 18-19) (emphasis added).  However, a claim under the state-created danger theory "require[s] an affirmative act, rather than inaction."  *See, e.g.*, *Ye*, 484 F.3d at 638; *D.R.*, 972 F.2d at 1374 ("nonfeasance ... do[es] not rise to the level of a constitutional violation."); *Morrow v. Balaski*, 719 F.3d 160, 179 (3d Cir. 2013); *Walter v. Pike Cty.,* 544 F.3d 182, 195 (3d Cir. 2008); *Burella v. City of Philadelphia*, 501 F.3d 134, 147–48 (3d Cir. 2007); *Benedict v. Sw. Pennsylvania Human Servs., Inc.*, 98 F. Supp. 3d 809, 824 (W.D. Pa. 2015).  Thus, Plaintiff's claim fails as a matter of law.

*Second*, a claim pursuant to the "state-created danger" theory requires Plaintiff to plead and prove that the state's affirmative act "rendered the citizen more vulnerable to danger than had the state not acted at all."  *Ye*, 484 F.3d at 642; *Green v. City of Philadelphia*, 92 F. App'x 873, 875-76 (3d Cir. 2004) ("When the officers returned the gun to White, it placed Green in no worse position than he would have been in without their temporary intervention, and that temporary intervention did not create any guarantee of Green's future safety"); *Starr v. Price*, 385 F. Supp. 2d 502, 508 (M.D. Pa. 2005) ("although the defendants took custody of the gun, when they returned it to Michael they placed Raienhna and Jacob in no worse position than had they not acted at all").  In this case, Plaintiff does not allege, nor could Plaintiff credibly allege, that Mr. Gill would be in a better position than if the Department had taken no action at all to combat COVID-19.  Accordingly, Plaintiff's Substantive Due Process claim fails as a matter of law for this additional reason.  *Ye*, 484 F.3d at 642; *Green*, 92 F. App'x at 875-76.

---

[9]  Plaintiff cannot, as a matter of law, assert a claim under the "special relationship" theory because the Third Circuit has held that this exception requires the state to have "physical custody" over the individual. *Ye*, 484 F.3d at 637, n.1; *D.R.*, 972 F.2d at 1370.

**(b).     Deliberate Indifference Under the Eighth Amendment**

Plaintiff also contends that the "policy failures of the DOH constitute deliberate indifference as the term has been defined to apply to Eighth Amendment cases applicable to convicted prisoners," and "immigration detainees," (Br. at 16), despite the fact that Plaintiff concedes that "[n]ursing home residents are not held against their will in the same sense" as these individuals. (*Id.* at 18).   This distinction, however, is not immaterial.   Indeed, it is substantively fatal to Plaintiff's claim.

A prerequisite to any claim under the Eighth Amendment is that the plaintiff "**is incarcerated** under conditions posing a substantial risk of serious harm."  *White v. New Jersey*, 514 F. App'x 258, 261 (3d Cir. 2013) (emphasis added); *Johnson v. Rendell*, 56 F. Supp. 2d 547, 550 (E.D. Pa. 1999) ("Because Johnson was in the custody of the Pennsylvania Department of Corrections, not the City of Philadelphia, he has failed to state a claim under the Eighth Amendment against the City Defendants"); *Benedict*, 98 F. Supp. 3d at 818 ("neither the Court, nor counsel, has uncovered case law recognizing Eighth Amendment protection for those not incarcerated or imprisoned"); *La Plant v. Frazier*, 564 F. Supp. 1095, 1097 (E.D. Pa. 1983).

Notably, the holdings of the two principal cases upon which Plaintiff relies are expressly based upon the fact that the government detained persons against their will.  *See Thakker v. Doll*, 2020 WL 1671563, at *7 (M.D. Pa. Mar. 31, 2020) (concerning a petition for writ of mandamus where the Court found that the civil immigration detainee was likely to succeed on the merits of his Fifth Amendment claim in which he alleged that there was no rational basis for continued *physical confinement*) *and Castillo v. Barr*, 2020 WL 1502864, at *3 (C.D. Cal. Mar. 27, 2020) (holding was expressly premised upon notion that "[w]hen the Government takes a person into custody and detains him against the person's will, the Constitution imposes upon the Government a duty to assume responsibility for that detainee's safety and general well-being").  But, it is

18

undisputed that Mr. Gill is not in Commonwealth custody or being detained against his will. Accordingly, Plaintiff's Eighth Amendment claim fails as a matter of law.  *White*, 514 F. App'x at 261; *Johnson*, 56 F. Supp. 2d at 550; *Benedict*, 98 F. Supp. 3d at 818-19.

### 2.    Plaintiff's RA and ADA Claims Fail as a Matter of Law.

"In order to present a successful claim under the ADA or the RA, a plaintiff must prove (1) he is a qualified individual; (2) he has a disability; (3) he was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by such entity; and (4) that such denial or discrimination was by reason of his disability."[10] *Boyd v. City of Philadelphia*, 2020 WL 1531454, at *8 (E.D. Pa. Mar. 31, 2020) (Kenney, J.); *CG v. Pennsylvania Dep't of Educ.*, 734 F.3d 229, 235 (3d Cir. 2013).  "In other words, Plaintiffs must show that they have been deprived of a benefit or opportunity provided to non-disabled [individuals] ... because of their disability."  *CG*, 734 F.3d at 235.

### (a).    Plaintiff Does Not Allege Any Current Policy or Action That Allegedly Discriminates Against Residents of SNFs.

Plaintiff argues that Mr. Gill is likely to succeed on the merits of his ADA and RA claims because Plaintiff asserts, in vague and conclusory terms, <u>and without citing any case law or record evidence</u>, that "the only accommodations which would not discriminate against the Plaintiffs are the actions proposed by Plaintiffs for the reasons previously set forth."  (Br. at 24-25).  According to Plaintiff, "[w]ithout an order directing the Department of Health to take the actions demanded, Plaintiffs will continue to suffer discrimination as a result of the application of the DOH policies."  (*Id.*).  However, even setting aside the impermissibility of attempting to substitute Plaintiff's counsels' own judgment for that of the Department, the "policies" that Plaintiff alleges are discriminatory have all been rescinded and replaced with new policies.

---

[10]  Plaintiff asserts claims under both Titles II and III of the ADA, however, only Title II applies to public entities such as Defendants.  *Emerson v. Thiel Coll.,* 296 F.3d 184, 189 (3d Cir. 2002).

In the Second Amended Complaint, Plaintiff alleges that "DOH's policies with regard to the treatment, oversight, testing, isolation and care of LTCFs residents, left out the residents of LTCFs which was discriminatory." (Doc. 15, ¶ 35). The first DOH "policy" that Plaintiff alleges is discriminatory is a March 22, 2020, Interim Guideline issued by the Department which stated: "When a situation is statewide: These triage guidelines apply to all healthcare professionals, clinics, and facilities in the Commonwealth of Pennsylvania. The guidelines apply to all patients." (*Id.*, ¶ 17). There is nothing discriminatory about this policy, as it plainly dictates equal treatment among "all healthcare professionals, clinics, and facilities in the Commonwealth of Pennsylvania," as well as "all patients." *See Easley by Easley v. Snider*, 36 F.3d 297, 305 (3d Cir. 1994) (the "main thrust" of the ADA and RA "is to assure" that individuals with disabilities receive the same benefits as individuals without disabilities). But, in any event, this allegedly discriminatory policy cannot possibly form the basis of Plaintiff's Motion because Plaintiff admits that this alleged "policy" was "revised," and that the revised policy is not discriminatory. (Doc. 15, ¶ 17). *Nextel Partners Inc. v. Kingston Twp.,* 286 F.3d 687, 693 (3d Cir. 2002) (where the defendant "removes those features ... being challenged by the claim, any claim for injunctive relief 'becomes moot as to those features.'"); *Hudson v. Robinson*, 678 F.2d 462, 465 (3d Cir. 1982) ("If a defendant has discontinued challenged activities (as this defendant has), the case is moot if there is no reasonable expectation that the wrong will be repeated."); *Providence Pediatric Med. Daycare Inc v. Alaigh*, 672 F. App'x 172, 175 (3d Cir. 2016) (same); *New Jersey Tpk. Auth.*, 772 F.2d at 31 (same).

Plaintiff also points to two Guidelines issued on March 18, 2020, and April 3, 2020, alleging that the two Guidelines discriminated against Plaintiff because they did not mandate or help organize testing of all residents (Doc. 15, ¶ 25) and all "asymptomatic staff or residents."

(*Id.*, ¶ 28).  However, like the March 22, 2020, Guidance, Plaintiff admits that both the March 18, 2020, and the April 3, 2020, Guidelines have been superseded by a May 12, 2020, policy, and are no longer in effect.  (*Id.*, ¶ 28 (pleading that April 3, 2020 Guidelines remained in place "***until*** the HAN issued May 12, 2020)); Doc.18-1, at 7 (admitting March 18, 2020 Interim Guidance was replaced by May 12, 2020 Notice)).  Thus, these policies cannot form the basis of Plaintiff's request for injunctive relief.  *Nextel Partners Inc.,* 286 F.3d at 693; *Hudson*, 678 F.2d at 465.  Notably, Plaintiff does not allege that the May 12, 2020, policy is discriminatory.  (Doc. 15).  And, Plaintiff concedes that, "all staff and residents" at Brighton (where Mr. Gill resides) "were being regularly tested" as of May 12, 2020.  (Doc.32-5, ¶ 31).

That leaves only Plaintiff's allegation that the Department set up "testing centers...within the state," but "there is no testing or insufficient testing being conducted within [SNFs] or on their staff."  (Doc. 15, ¶ 26).  On June 8, 2020, however, the Secretary issued a "universal testing order," directing that all SNF residents and staff must be tested.  (Ex. 1, Boateng Decl., ¶ 23).

Thus, each of the policies that Plaintiff alleges is "discriminatory" is no longer in effect (nor were they discriminatory in the first instance).[11]  Accordingly, Plaintiff cannot, as a matter of law, rely upon these allegedly discriminatory policies in seeking injunctive relief.  *Nextel Partners Inc.,* 286 F.3d at 693; *Hudson*, 678 F.2d at 465; *Alaigh*, 672 F. App'x at 175.

> **(b).**   **Plaintiff Has Failed to Allege That Defendants Took Any Action "Because of" Mr. Gill's Alleged Disabilities.**

Both the ADA and the RA have a causation element that must be met, but that is

---

[11]  Plaintiff's reliance on *Olmstead v. L.C. ex rel Zimring*, 527 U.S. 581 (1999) and *S.R. v. Pa. Dept of Human Servs*., 309 F. Supp. 3d 250 (M.D. Pa. 2018), is misplaced and stems from the inept analogy of SNF residents to individuals who are institutionalized by the State against their will.  *Olmstead* holds that "**unjustified institutional isolation** of persons with disabilities is a form of discrimination."  *Olmstead*, 527 U.S. at 600; *S.R.*, 309 F. Supp. 3d 250 (concerning institutionalized individuals).  "Olmstead's integration mandate appears to apply primarily to patients with mental health disabilities."  *Kongtcheu v. Constable*, 2016 WL 270075, at *7 (D.N.J. Jan. 20, 2016), *aff'd*, 674 F. App'x 216 (3d Cir. 2016).

conspicuously absent in this case.  "[T]he RA's causation requirement requires disability to be the sole cause of discrimination," and thus, "an alternative cause is fatal to an RA claim because disability would no longer be the sole cause."  *CG*, 734 F.3d at 236 n.11.  Under the ADA, an alternative cause is also fatal to the Plaintiff's claim unless the Plaintiff can demonstrate that the disability nonetheless "had a determinative effect on the outcome."  *Id.*

In general, "[t]o satisfy either causation requirement, Plaintiffs must prove that they were treated differently based on the protected characteristic, namely the existence of their disability." *Id.* at 236; *see also Lamberson v. Pennsylvania*, 561 F. App'x 201, 207 (3d Cir. 2014).[12]  This means that "[a] plaintiff cannot make out a claim ... merely by proving (1) that he was denied some service and (2) he is disabled."  *Lindstrom v. St. Joseph's Sch. for the Blind, Inc.*, 2016 WL 5723658, at *5 (D.N.J. Sept. 30, 2016).

For example, in *Rhoads v. A.I. DuPont Hosp. for Children of the Nemours Found.*, 2006 WL 1409633 (E.D. Pa. May 22, 2006), the plaintiff alleged that the defendants violated the ADA and RA because "the scheme of care and management at the Cardiac Center" resulted in "treatment under lower standards than patients in other departments."  *Id.* at *2.  The Court dismissed the claims, however, because it concluded that there was no evidence that the defendant "established its allegedly deficient standards . . . for the purpose of discriminating against those with heart conditions."  *Id.* at *3.

Similarly, Plaintiff does not present any evidence, or even allege, that Defendants took, or failed to take, any action "for the purpose of discriminating" against Mr. Gill.  That is because

---

[12]  This causation requirement likewise applies to a claim that alleges a failure to accommodate, *i.e.*, that the failure to accommodate was because of the plaintiff's disability.  *See Liberty Res., Inc. v. Philadelphia Hous. Auth.*, 528 F. Supp. 2d 553, 565 (E.D. Pa. 2007) ("only after a plaintiff has established a prima facie case of disability discrimination must the court undertake a reasonable accommodation analysis."); *Kongtcheu*, 2016 WL 270075, at *7 ("Plaintiff has not alleged a prima facie case of discrimination under the ADA or RA because Plaintiff has not alleged Defendant's failure to accommodate him was due to his disability.")

Defendants did not take any actions or implement any policies "because of" Mr. Gill's alleged disability.  Rather, Defendants' actions were taken solely for the purpose of combating the COVID-19 pandemic and slowing its spread throughout the Commonwealth of Pennsylvania. (Ex. 1, Boateng Decl., ¶¶ 9, 40).

In fact, Plaintiff admits that Mr. Gill's alleged injuries were not based upon some discriminatory animus of Defendants.  Rather, Plaintiff asserts that any effect on Mr. Gill was "unintended" and that the Department is "composed of well-meaning individuals."  (Br. at 2). By Plaintiff's own concession, these "well-meaning" individuals implemented the challenged policies in order to combat the global COVID-19 crisis, not 'because of' Mr. Gill's alleged disability.  Accordingly, Plaintiff's ADA and RA claims fail as a matter of law.   *CG*, 734 F.3d at 236; *Lamberson*, 561 F. App'x at 207; *Rhoads*, 2006 WL 1409633, at *2-3.

> ### (c).   Plaintiff's Proposed Accommodations Would Fundamentally Alter, and Hamper, the Department's COVID Response.

"When analyzing whether a violation of either Title II or Section 504 has occurred, the first step a court must take in a disability discrimination case is to determine if there is a prima facie showing of discrimination." *Liberty Res., Inc.*, 528 F. Supp. 2d at 565. "Once a plaintiff establishes a prima facie showing of discrimination, he or she has the burden of articulating reasonable accommodations that the defendant can make in order to comply with the ADA and the RA." *Id.*  "The burden then shifts to the defendant to make any reasonable accommodations, unless the defendant can prove that the accommodations would be unduly burdensome or fundamentally alter the program." *Id.*; *Easley*, 36 F.3d at 305 ("The test to determine the reasonableness of a modification is whether it alters the essential nature of the program or imposes an undue burden or hardship in light of the overall program."). Here, it is obvious that Plaintiff's proposed accommodations would fundamentally alter the Department's successful

response to the COVID-19 crisis, and therefore, cannot form the basis of an RA or ADA claim.

### 3.    Plaintiff's FNHRA Claim Fails as a Matter of Law Because FNHRA Does Not Impose Any Obligations Upon Defendants.

In Plaintiff's final claim, Plaintiff argues, in vague and conclusory fashion, and without any citation to any case law, that "the DOH and Secretary Levine are obligated to follow and abide by the federal statutes that govern nursing and long-term care facilities" because they allegedly accept federal funds.  (Br. at 25).[13]  Plaintiff contends, again without any citation, that "[b]ecause DOH's policies govern all aspects of prevention, treatment, mitigation and monitoring of residents with regard to COVID-19, Defendants are obligated to follow the statutory provisions applicable to [SNFs]," and thus, they are likely to succeed on a claim under FNHRA, brought pursuant to § 1983 (*Id*.)  But, Plaintiff cannot cite any case law that would support these assertions because no such case law exists.

Indeed, FNHRA expressly applies to and imposes obligations upon entities that meet the statutory definition of "nursing facility."  Defendants plainly do not fall within the statutory definition of "nursing facility"[14] and thus the statute does not impose any obligations upon them.[15]  The Department does not own or operate any SNFs, including Brighton where Mr. Gill resides; rather, it is the Commonwealth entity responsible for regulating SNFs.  (Ex. 1, Boateng Decl., ¶ 11).

---

[13]  Again, the only cognizable claim under §1983 would be for prospective injunctive relief against Dr. Levine in her official capacity.  *See Will*, 491 U.S. at 71.

[14]  A "nursing facility" is "an institution ... which—(1) is primarily engaged in providing to residents—(A) skilled nursing care and related services... (B) rehabilitation services... or (C) ... health-related care and services to individuals who because of their mental or physical condition require care and services ... which can be made available to them only through institutional facilities...; (2) has in effect a transfer agreement ... with one or more hospitals having agreements ... under section 1395cc of this title; and (3) meets the requirements for a nursing facility described in [1396r(c), (d)]." 42 U.S.C. § 1396r(a).

[15]  In each case that Plaintiff relies upon, the claims were brought *against nursing facilities that were either owned or operated by the County*.  *See Grammer v. John J. Kane Reg'l Centers-Glen Hazel*, 570 F.3d 520, 522 (3d Cir. 2009) (facility "operated by Allegheny County");  *Robinson v. Fair Acres Geriatric Ctr.*, 722 F. App'x 194, 196 (3d Cir. 2018) (facility "owned by Delaware County").

Moreover, even if this statute did impose obligations upon Defendants, which it does not, Plaintiff fails to point to any provision of the statute that Defendants allegedly violated. (Br. at 25-26). Instead, Plaintiff vaguely asserts that Defendants denied Plaintiff "oversight, protection, care, safety, wellbeing and all other protections due to them under FNHRA." (*Id.* at 26). This fails to show "indisputably clear need" for relief. *Victory*, 789 F. App'x at 334.

### F. THE PUBLIC INTEREST WEIGHS HEAVILY IN FAVOR OF DENYING PLAINTIFF'S MOTION.

The final two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). In the wake of COVID-19, numerous federal appellate Courts of Appeal have held that the public interest weighs heavily against granting an injunction against a state agency because doing so interferes with the state's COVID-19 response, which is evolving day-to-day, and because it usurps the authority and expertise of the state agency. As the Eleventh Circuit explained in vacating an injunction:

> In large measure, the injunction transfers the power to administer the Metro West facility in the midst of the pandemic from public officials to the district court. The injunction hamstrings MDCR officials with years of experience running correctional facilities, and the elected officials they report to, from acting with dispatch to respond to this unprecedented pandemic. They cannot respond to the rapidly evolving circumstances on the ground without first seeking a permission slip from the district court.

*Swain v. Junior*, 958 F.3d 1081, 1090 (11th Cir. 2020); *see also Valentine v. Collier*, 956 F.3d 797, 803 (5th Cir. 2020); *Swain v. Junior*, 2020 WL 3167628, at *12 (11th Cir. June 15, 2020); *Esshaki v. Whitmer*, 2020 WL 2185553, at *2 (6th Cir. May 5, 2020). Accordingly, the final two factors also weigh heavily in favor of denying Plaintiff's Motion for Preliminary Injunction.

## IV. <u>CONCLUSION</u>

For all the foregoing reasons, Defendants respectfully request that the Court deny Plaintiff's Motion for Preliminary Injunction as a matter of law.

Respectfully submitted,

**ELLIOTT GREENLEAF, P.C.**

/s/ *Jarad W. Handelman*
JARAD W. HANDELMAN (PA#82629)
TIMOTHY T. MYERS (PA#46949)
GREGORY S. VOSHELL (PA#208566)
THOMAS B. HELBIG (PA#321470)

17 North Second Street, Suite 1420
Harrisburg, PA 17101
(717) 370-2600

Dated: June 26, 2020                    *Counsel for Defendants*

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that a copy of the foregoing was served upon all counsel of record via the Court's electronic filing system.

Dated: June 26, 2020                                   <u>/s/ *Jarad W. Handelman*            </u>
                                                                          JARAD W. HANDELMAN